IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

KATHRYN LISTER,

        Plaintiff,

v.                                                                                    CIV. NO. 13-570 GBW

CAROLYN W. COLVIN, *Acting Commissioner of the Social Security Administration*,

        Defendant.

**ORDER GRANTING PLAINTIFF'S MOTION TO REVERSE OR REMAND**

This matter comes before the Court on Plaintiff's Motion and Memorandum to Reverse or Remand the Social Security Agency (SSA) Commissioner's decision to deny Plaintiff disability insurance benefits.  *Docs. 19, 20*.  For the reasons discussed below, the Court GRANTS Plaintiff's motion and REMANDS this action to the Commissioner for further proceedings consistent with this opinion.

I.      BACKGROUND

    A.  **Plaintiff's Medical History**

Plaintiff is a 54-year-old woman who claims disability based on impairments including severe fibromyalgia, cervical spine impairments, and osteoarthritis in both her knees.  *Doc. 20* at 2; *doc. 24* at 1.  Fibromyalgia is "[a] condition involving lack of stage IV sleep and chronic diffuse widespread aching and stiffness of muscles and soft tissues." Stedman's Medical Dictionary for the Health Professions and Nursing 541 (Thomas L. Stedman et al. eds., 5th ed. 2005).

1

Plaintiff began seeing her primary physician, Dr. Ronald Sautter, MD, in January 2007. AR at 417. On August 15, 2007, Plaintiff had an appointment with Dr. Sautter to follow up on a bariatric surgery she had undergone in June. AR at 325. Dr. Sautter's assessment at the time included depression and anxiety, and he prescribed Plaintiff Zoloft and Ambien. AR at 326. Plaintiff met with Dr. Sautter again on September 18, 2007, complaining of "multiple joint aches" affecting "her fingers, elbows, shoulders and hips." AR at 323. Dr. Sautter found that Plaintiff had bilateral "arthralgias," defined as "[s]evere pain in a joint, especially one not inflammatory in character," (Stedman's Medical Dictionary 149 (Marjory Spraycar et al. eds., 26th ed. 1995) [hereinafter Stedman's]), which could be associated with her then recent weight loss. AR at 324. He also assessed depression and insomnia. AR at 324. Dr. Sautter prescribed Plaintiff 200-400 mg of liquid ibuprofen three to four times a day for her pain, as well as Effexor and Ambien. AR at 323-24.

In October 2007, Dr. Sautter noted that Plaintiff's joint pains were "much better at this point" and found that she was "rarely using the ibuprofen." AR at 320. He also renewed Plaintiff's ongoing prescriptions for Nadolol and Armour Thyroid for hyperthyroidism. AR at 321.

Plaintiff consulted Dr. Leroy A. Pacheco, MD, a specialist in rheumatology, in 2008. AR at 93. On April 28, 2008, she sought treatment for arthralgias and "myalgias," or "muscular pain," (Stedman's at 1161), and requested an evaluation regarding a

2

positive antinuclear antibodies[1] test. AR at 93. At that time, Plaintiff reported "intermittent[] pain in various joints, including her hips, hands and knees," as well as "in her elbows, fingers, neck and low back." AR at 93. She was also suffering from frequent headaches and fatigue. AR at 93. Dr. Pacheco's assessment noted a history of arthralgias. AR at 94. He stated that Plaintiff's symptoms may be due to her osteoarthritis, but could also have a number of other causes. Dr. Pacheco hypothesized that Plaintiff was suffering from a connective tissue disorder, but that diagnosis was not confirmed. AR at 94, 339.

In May 2008, around the same time Plaintiff had seen Dr. Pacheco, Plaintiff also Dr. Sautter regarding "[s]ome back pain, headaches, dizziness, insomnia and abnormal lab results." AR at 283. Dr. Sautter recommended using "Tylenol and heat and some range of motion exercises for her back and neck." AR at 284.

On October 2, 2008, Plaintiff saw Dr. Sautter for medication refills and to follow up on her pain. She reported "having some bilateral hip pain and a bilateral shoulder pain that is 3-5/10 at times, but other days is normal." AR at 281. Later that month, on October 23, 2008, Plaintiff informed Dr. Pacheco that her pain was getting worse and that she had "been unable to work for the last two weeks because the pain is so severe." AR at 338. She described pain around her neck, shoulders, and hips. AR at 338. Dr. Pacheco stated that he was "not really sure why she [was] having so much pain," and scheduled

---

[1] An "antinuclear antibody" is defined as "an [antibody] showing an affinity for cell nuclei, demonstrated by exposing a cell substrate to the serum to be tested, followed by exposure to an antihuman-globulin serum conjugated with fluorescein; development of specific nuclear fluorescence is a positive reaction; this [antibody] is found in the serum of a high proportion of patients with systemic lupus erythematosus, rheumatoid arthritis, and certain collagen diseases, in some of their healthy relatives, and in about 1% of normal individuals." Stedman's at 100.

x-rays and additional laboratory studies. AR at 338. He prescribed Plaintiff Percocet for the pain and Valium for her insomnia. AR at 338.

At Plaintiff's follow-up examination with Dr. Pacheco on November 25, 2008, he noted that Plaintiff's laboratory studies had "returned within normal limits." AR at 337. The x-rays showed "some very mild changes consistent with early osteoarthritis" in her hips, and "some cervical spondylosis with suggestion of muscle spasm" in her shoulders. AR at 337. Dr. Pacheco's assessment reported that he was "really not certain whey [sic] she is having so many arthralgias." AR at 337. While her pain seemed to be myofascial in nature, he did "not think she qualifie[d] as having fibromyalgia syndrome." AR at 337. He prescribed Plaintiff Lyrica in an effort to mitigate her overall symptomatology.

When Plaintiff next met with Dr. Pacheco on February 19, 2009, she reported that "she did take the Lyrica and while it seemed to help a bit, she [did] not feel it [was] working nearly as well as she would like." AR at 335. Dr. Pacheco terminated the Lyrica prescription and prescribed Plaintiff Cymbalta. AR at 335. His assessment was myofascial pain and arthralgias. AR at 335. Plaintiff told Dr. Pacheco that she was going to see a neurologist soon because "[s]he was concerned about the possibility of her having MS [multiple sclerosis]." AR at 335.

Plaintiff met with a neurologist, Dr. Douglas Barrett, MD, on March 3, 2009. AR at 409. Dr. Barrett noted Plaintiff's symptomology and history of pain, but found "no clear evidence to suggest" that she had multiple sclerosis. AR at 412. He ordered an MRI of her brain and her lumbosacral spine. AR at 412.

The following month, April 2009, Dr. Sautter diagnosed Plaintiff with, and began treating her for, fibromyalgia. AR at 304, 306, 334. On April 14, 2009, Plaintiff reported to Dr. Sautter that she had pain on a daily basis from her neck down to her feet. AR at 306. Dr. Sautter assessed fibromyalgia and prescribed Buspirone. AR at 306. He also noted that, since her fibromyalgia symptoms had begun, Plaintiff's "cognitive abilities" had somewhat decreased. AR at 304. Plaintiff reported having trouble concentrating due to her pain, and was planning to take time off work to rest. AR at 304. Dr. Sautter noted that neither Lyrica nor Cymbalta had helped alleviate Plaintiff's symptoms. AR at 304.

Dr. Sautter saw Plaintiff again in June 2009, but her condition remained largely unchanged. AR at 301-02. She discussed bowel incontinence and reported that her anxiety had been much less since taking Buspirone. AR at 301. Her fibromyalgia, however, "[did] not seem to be any different." AR at 301.

In July 2009, Dr. Pacheco assessed Plaintiff with "myofascial pain/fibromyalgia" and again prescribed her Lyrica. AR at 333. Plaintiff reported "that she is having continuing difficulties at work, as her work situation is demanding physically and she is probably going to have to take a medical retirement." AR at 333.

Dr. Sautter wrote a letter to Plaintiff's employer, Ms. Brudevold-Black, on August 31, 2009, stating that he "[did] not believe Ms. Lister [would] be able to return to full-time duties or regular assignments due to her fibromyalgia pain." AR at 293. He explained that Plaintiff's pain had "been an ongoing problem" and was "becoming more severe." AR at 293. In particular, Dr. Sautter concluded that Plaintiff could not sit or concentrate

5

for a long period of time, and that "work days would need to be less than 4 hours at a time." AR at 294. He did not expect Plaintiff to even partially recover. AR at 294.

Plaintiff next saw Dr. Pacheco in September 2009. She reported that she did not feel her medications had been helpful, and again noted difficulties at work, stating that "[s]he ha[d] not been to work except on a very part-time basis recently." AR at 331. Dr. Pacheco assessed Plaintiff with "mild to moderate osteoarthritis affecting the knees and other areas," "myfascial pain/fibromyalgia," "chronic pain syndrome," and "chronic fatigue." AR at 331. Later that month, Dr. Pacheco completed a fibromyalgia questionnaire in which he stated that he had diagnosed Plaintiff with osteoarthritis, fibromyalgia, and a history of morbid obesity. AR at 158. These impairments, he reported, could reasonably be expected to produce pain, as well as fatigue, stiffness, memory issues, and poor sleep. AR at 158. Dr. Pacheco identified 12 out of 18 tender point sites as "positive," indicating a diagnosis of fibromyalgia. AR at 158-59; *see also* Stedman's Medical Dictionary for the Health Professions and Nursing 541 (Thomas L. Stedman, et al. eds., 5th ed. 2005) ("diagnosis [of fibromyalgia] requires 11 out of 18 specific tender points" throughout the body). Additionally, he concluded that Plaintiff would not be able to sustain an 8-hour work day, found that her fibromyalgia symptoms would interfere with her "ability to focus attention on work-related tasks in a competitive work environment for increments of at least two (2) hours at a time," and estimated that Plaintiff's symptoms would result in frequent absences from work. AR at 160.

Samuel Pallin, MD, a medical consultant, completed a Physical Residual

6

Functional Capacity Assessment ("RFC") for Plaintiff on October 14, 2009, based on a review of her medical records. AR at 363. He found that she could occasionally lift 20 pounds, frequently lift 10 pounds, stand and/or walk for at least 2 hours in an 8-hour workday, and sit for about 6 hours in an 8-hour workday. AR at 364. Dr. Pallin determined that her ability to push and pull was unlimited. AR at 364. He found no established postural limitations, manipulative limitations, visual limitations, communicative limitations, or environmental limitations. AR at 365-67. He ultimately concluded that "[w]hile the claimant may have difficulty sustaining a full time, stressful job which requires long hours, it is reasonable to assume she should be able to do less stressful, less demanding work." AR at 369. Dr. Pallin filled out a disability determination form on November 30, 2009, in which he referenced the RFC form and determined that Plaintiff's "RFC shows physical capacity for a full range of light level work." AR at 65-66.

Plaintiff met with Dr. Sautter again on June 6, 2011. AR at 428. He noted her active problems, which included fibromyalgia, backache, chronic pain, hypothyroidism, pain disorder associated with psychological factors, and recurrent major depression in full remission. AR at 428. On the same day as Plaintiff's examination, Dr. Sautter completed a questionnaire in which he stated that Plaintiff had been diagnosed with fibromyalgia and major depression. He reported that her diagnosis was based on trigger points, and that she was currently prescribed Armour Thyroid, Cyclobenzaprine, Nadolol, Venlafaxine, and Zolpidem. AR at 417. He concluded that she would not be

7

able to work part-time, and would need 15-minute rest breaks every hour during an 8-hour work day.  AR at 418.

At Plaintiff's appointment with Dr. Sautter on June 28, 2011, she reported that she was "feeling relatively well" and "[felt] her depression and her fibromyalgia [were] essentially controlled at this point."  AR at 424.

Subsequent to Plaintiff's administrative hearing on August 23, 2011, Plaintiff underwent a consultative examination by Dr. Laura Briggs, MD.  AR at 473-76.  Dr. Briggs assessed Plaintiff's fibromyalgia on October 18, 2011, and stated her impression that, while Plaintiff had "medical records supporting the diagnosis of fibromyalgia," she found "no objective evidence to support any functional limitation based on her fibromyalgia" based on the consultative examination.  AR at 475.

### B. Procedural History

Plaintiff filed her Title II application for disability insurance benefits on July 15, 2009, alleging disability beginning on May 25, 2009.  AR at 11.  Her claims were denied on November 30, 2009, and, after Plaintiff's request for reconsideration, were again denied on June 8, 2010.  AR at 11, 68, 73.

Plaintiff requested a hearing before an Administrative Law Judge (ALJ), and a hearing was held before ALJ Donna Montano on August 23, 2011, in Albuquerque, New Mexico.  AR at 11.  The ALJ issued her decision on March 5, 2012, denying Plaintiff's request for benefits.  AR at 8-19.  In making this decision, the ALJ applied the required five-step sequential analysis.

At step one, the ALJ first determined that Plaintiff had not engaged in substantial gainful activity since May 25, 2009, the alleged onset date of her disability. AR at 13. Next, at step two, she found that Plaintiff had the following severe impairments: "fibromyalgia, degenerative joint disease and history of obesity, status post gastric bypass with good weight loss." AR at 13. At step three, the ALJ concluded that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of a listed impairment. AR at 13-14. The ALJ next determined that Plaintiff had a residual functional capacity (RFC) to perform "a range of light work." AR at 14. Specifically, Plaintiff was found to be able to "lift 10 pounds frequently and 20 pounds occasionally, stand and/or walk at least 2 hours in a [sic] 8-hour workday, sitting about 6 hours in an 8-hour workday." AR at 14. The ALJ concluded that, in light of her RFC, Plaintiff was, in fact, able to perform her past relevant work as a Budget Finance Officer. AR at 18. The ALJ therefore concluded that Plaintiff was not disabled. AR at 19.

Plaintiff appealed to the Appeals Counsel on April 5, 2012, and her appeal was denied on May 6, 2013. AR at 1-3, 6-7. She filed her complaint in the instant matter on June 18, 2013. *Doc. 1*.

II.  **APPLICABLE LAW**

   A.  **Standard of Review**

Pursuant to 42 U.S.C. § 405(g), a court may review a final decision of the Commissioner only to determine whether it (1) is supported by "substantial evidence," and (2) comports with the proper legal standards. *Casias v. Sec'y of Health & Human Serv.*,

933 F.2d 799, 800-01 (10th Cir. 1991). "In reviewing the ALJ's decision, 'we neither reweigh the evidence nor substitute our judgment for that of the agency.'" *Bowman v. Astrue*, 511 F.3d 1270, 1272 (10th Cir. 2008).

Substantial evidence is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Casias*, 933 F.3d at 800. "The record must demonstrate that the ALJ considered all of the evidence, but an ALJ is not required to discuss every piece of evidence." *Clifton v. Chater*, 79 F.3d 1007, 1009-10 (10th Cir. 1996). "[I]n addition to discussing the evidence supporting his decision, the ALJ must also discuss the uncontroverted evidence he chooses not to rely upon, as well as significantly probative evidence he rejects." *Id*. at 1010. "The possibility of drawing two inconsistent conclusions from the evidence does not prevent [the] findings from being supported by substantial evidence." *Lax v. Astrue*, 489 F.3d 1080, 1084 (10th Cir. 2007) (citing *Zoltanski v. F.A.A.*, 372 F.3d 1195, 1200 (10th Cir. 2004)).

### B. Disability Determination Process

For purposes of Social Security disability insurance benefits, an individual is disabled when he is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). To determine whether a person satisfies these criteria, the SSA has developed a five-step test. *See* 20 C.F.R. § 404.1520. If the

Commissioner is able to determine whether an individual is disabled at one step, he does not go on to the next step. *Id*. § 404.1520(a)(4). The steps are as follows:

(1) Claimant must establish that he is not currently engaged in "substantial gainful activity." If claimant is so engaged, he is not disabled.
(2) Claimant must establish that he has "a severe medically determinable physical or mental impairment . . . or combination of impairments" that have lasted for at least one year. If claimant is not so impaired, he is not disabled.
(3) Claimant must establish that his impairment(s) are equivalent to a listed impairment that has already been determined to be so severe as to preclude substantial gainful activity. If listed, the impairment(s) are presumed disabling.
(4) If the claimant's impairment(s) are not listed, claimant must establish that the impairment(s) prevent him from doing his "past relevant work." If claimant is capable of returning to his past relevant work, he is not disabled.
(5) If claimant establishes that the impairment(s) prevent him from doing his past relevant work, the burden shifts to the Commissioner to show that claimant is able to "make an adjustment to other work." If the Commissioner is unable to make that showing, claimant is deemed disabled.

*See* 20 C.F.R. § 1520(a)(4); *Fischer-Ross v. Barnhart*, 431 F.3d 729, 731 (10th Cir. 2005).

Step four of this analysis consists of three phases. *Winfrey v. Chater*, 92 F.3d 1017, 1023 (10th Cir. 1996). First, the ALJ determines the claimant's residual functional capacity in light of "all of the relevant medical and other evidence." 20 C.F.R. § 404.1545(a)(3). A claimant's RFC is "the most [he] can still do despite [his physical and mental] limitations." *Id*. § 404.1545(a)(1). Second, the ALJ determines the physical and mental demands of claimant's past work. "To make the necessary findings, the ALJ must obtain adequate 'factual information about those work demands which have a bearing on the medically established limitations.'" *Winfrey*, 92 F.3d at 1024 (quoting Social Security Ruling 82-62 (1982)). Third, the ALJ determines whether, in light of his RFC, the claimant

11

is capable of meeting those demands. *Id*. at 1023, 1025.

### III.   ANALYSIS

Plaintiff does not challenge the ALJ's determination at steps one, two, or three of the sequential analysis. Instead, Plaintiff argues that the ALJ erred at step four by (1) failing to give proper weight to the opinions of the physicians, (2) erroneously finding that Plaintiff could perform light work, and (3) failing to provide specific findings regarding the physical and mental demands of Plaintiff's past relevant work. *See generally doc. 20*. The Court, having carefully reviewed the record and applicable law, finds that the ALJ erred in evaluating the medical opinions in the record, and therefore grants Plaintiff's request for remand.

### A. The ALJ's decision does not comport with the applicable legal standards for assessing treating source opinions.

Plaintiff argues that the ALJ erred when she gave less weight to the opinions of Plaintiff's treating physicians, Dr. Pacheco and Dr. Sautter, than to the opinions of other physicians in the record. AR at 19. The Commissioner counters that "the ALJ considered these opinions and discussed the reasons for giving them little weight." *Doc. 21* at 5.

An ALJ is required to give controlling weight to a treating physician's well-supported opinion if it is not inconsistent with other substantial evidence in the record. 20 C.F.R. § 404.1527(c)(2). When evaluating the weight to be given to a treating physician's opinion, the ALJ must complete a two-step inquiry. First, she considers "whether the opinion is well supported by medically acceptable clinical and laboratory diagnostic

techniques and is consistent with the other substantial evidence in the record." *Pisciotta v. Astrue*, 500 F.3d 1074, 1077 (10th Cir. 2007). If the opinion meets both criteria, the ALJ must give the opinion controlling weight. *Id.*

If the ALJ properly concludes that the treating physician's opinion is not entitled to controlling weight, the ALJ must proceed to the second step of the inquiry and determine the amount of weight to be given to the opinion. "Treating source medical opinions are still entitled to deference and must be weighed using all of the factors provided in 20 C.F.R. 404.1527 and 416.927." *Watkins v. Barnhart*, 350 F.3d 1297, 1300 (10th Cir. 2003) (quoting Social Security Ruling (SSR) 96-2p, 1996 WL 374188, at *4 (July 2, 1996)). These factors are:

> (1) the length of the treatment relationship and the frequency of examination; (2) the nature and extent of the treatment relationship, including the treatment provided and the kind of examination or testing performed; (3) the degree to which the physician's opinion is supported by relevant evidence; (4) consistency between the opinion and the record as a whole; (5) whether or not the physician is a specialist in the area upon which an opinion is rendered; and (6) other factors brought to the ALJ's attention which tend to support or contradict the opinion.

*Id.* at 1301.

"Unless good cause is shown to the contrary, the Secretary must give substantial weight to the testimony of the claimant's treating physician." *Byron v. Heckler*, 742 F.2d 1232, 1235 (10th Cir.1984) (citations omitted). "Generally, we give more weight to opinions from your treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be

13

obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations." 20 C.F.R. § 404.1527(c)(2). "[W]hen a treating physician's opinion is inconsistent with other medical evidence, the ALJ's task is to examine the other physicians' reports to see if they outweigh the treating physician's report, not the other way around." *Hamlin v. Barnhart*, 365 F.3d 1208, 1215 (internal quotations omitted).

### 1. *The ALJ erred in failing to afford controlling weight to Dr. Pacheco's September 2009 fibromyalgia questionnaire.*

Plaintiff contends that Dr. Pacheco's opinion in the September 2009 fibromyalgia questionnaire is entitled to controlling weight because the ALJ improperly found that the questionnaire was inconsistent with Dr. Pacheco's prior findings.

As stated above, the opinion of a treating physician must be given controlling weight if it "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(c)(2). A treating source's opinion is inconsistent with other substantial evidence in the record when there is "such relevant evidence as a reasonable mind would accept as adequate to support a conclusion that is contrary to the conclusion expressed in the medical opinion." *Titles II & XVI: Giving Controlling Weight to Treating Source Med. Opinions*, SSR 96-2p, 1996 WL 374188 (July 2, 1996).

Here, the ALJ rejected Dr. Pacheco's 2009 fibromyalgia questionnaire on the basis that it was "inconsistent with the doctor's own prior findings." AR at 15. She offered two

14

bases for this conclusion.  First, Dr. Pacheco's treatment notes from April 28, 2008, indicated that he believed "a lot of [Plaintiff's pain] could simply represent some osteoarthritis that has developed while she was morbidly obese . . . ."  AR at 414.  Second, his notes from Plaintiff's November 25, 2008 visit said that he "did not think she did [sic] qualified for having fibromyalgia syndrome."  AR at 15.  The ALJ concluded that the above statements conflicted with Dr. Pacheco's findings in the September 2009 questionnaire that Plaintiff had severe functional limitations because of her fibromyalgia.

Plaintiff argues, and the Court agrees, that the ALJ erred in concluding that Dr. Pacheco's questionnaire was inconsistent with his prior treatment notes.  As an initial matter, both of the statements on which the ALJ relies were made prior to Plaintiff's alleged disability onset date.  Although no rule prohibits an ALJ from considering statements made by physicians before a claimant's alleged onset date, courts generally give this type of evidence limited weight.  *See, e.g., Carmickle v. Comm'r, Soc. Sec. Admin.*, 533 F.3d 1155, 1165 (9th Cir. 2008) ("[M]edical opinions that predate the alleged onset of disability are of limited relevance.").  This is especially true where, as here, the claimant has a condition that is deteriorating over time.  *Cf. Vandenboom v. Barnhart*, 421 F.3d 745, 750 (allowing medical records dated prior to alleged onset date to be considered where there was no indication that claimant's symptoms were progressive in nature).  Plaintiff reported throughout 2008 that her symptoms "ha[d] actually been getting worse . . . ."  AR at 338.  Dr. Sautter also noted this in his letter to Plaintiff's employer months later, when he stated that Plaintiff's condition was "becoming more severe."  AR at 293.

15

Because Plaintiff's ailments were getting worse over time, the ALJ should have given little weight to statements made by Dr. Pacheco prior to Plaintiff's alleged onset date.

More importantly, neither of Dr. Pacheco's statements referenced by the ALJ were, in fact, inconsistent with a diagnosis of fibromyalgia. Fibromyalgia is "diagnosed by ruling out other diseases through medical testing." *Lantow v. Chater*, 98 F.3d 1349, at *1 (10th Cir. Oct. 8, 1996) (unpublished). In 2008, Dr. Pacheco was still ordering new tests and prescribing Plaintiff various medications in an attempt to diagnose her condition. In fact, his statement that he did "not think she qualifie[d] as having fibromyalgia syndrome" was preceded by a candid admission that he was "really not certain" what was causing her symptoms. AR at 337. When Plaintiff did not respond positively to any medications, Dr. Pacheco eventually began treating her for fibromyalgia. Thus, Dr. Pacheco's treatment notes, rather than being inconsistent, accurately reflected the process of diagnosing fibromyalgia by ruling out alternative possibilities. The Court thus declines to find any inconsistency on this basis.

In its reply brief, the Commissioner provides additional reasons to support the ALJ's finding that Dr. Pacheco's fibromyalgia questionnaire was inconsistent with his own prior findings or other evidence on the record. For example, the Commissioner argues that Dr. Pacheco's September 2009 treatment notes do not assess any functional limitations based on Plaintiff's fibromyalgia. *Doc. 21* at 5. It is well established, however, that "[w]e must evaluate the ALJ's decision based solely on the reasons in the stated decision." *Jones v. Colvin*, 514 F. App'x 813, 819 (10th Cir. 2013) (internal quotations

omitted). The ALJ did not rely on Dr. Pacheco's September 2009 treatment notes in finding the fibromyalgia questionnaire inconsistent with other substantial evidence on the record, and the Court may not, therefore, consider that argument.

For the foregoing reasons, the Court finds that the statements of Dr. Pacheco on which the ALJ relied do not constitute "such relevant evidence as a reasonable mind would accept as adequate to support a conclusion that is contrary to the conclusion expressed in the medical opinion." *Titles II & XVI: Giving Controlling Weight to Treating Source Med. Opinions*, SSR 96-2p, 1996 WL 374188 (July 2, 1996). Absent other indicia of inconsistency, the ALJ's conclusion that the September 2009 fibromyalgia questionnaire is inconsistent with Dr. Pacheco's prior findings is not supported by substantial evidence. The ALJ therefore erred in failing to afford this opinion controlling weight. Accordingly, the Court will remand this case to the ALJ.

### 2. *The ALJ committed legal error by failing to conduct the six-factor analysis for assigning weight to non-controlling treating source opinions.*

Assuming, *arguendo*, that the ALJ properly afforded Dr. Pacheco's opinion less than controlling weight, the ALJ still erred by failing to perform the second step of the analysis. "[I]n evaluating the medical opinions of a claimant's treating physician, the ALJ must complete a sequential two-step inquiry, each step of which is analytically distinct." *Krauser v. Astrue*, 638 F.3d 1324, 1330 (10th Cir. 2011). Once the ALJ has properly declined to afford controlling weight to a treating source opinion, step two of the analysis requires the ALJ to consider the six factors outlined in 20 C.F.R. § 404.1527(c)(1)-(6). At the second

step, "the ALJ must make clear how much weight the opinion is being given (including weather it is being rejected outright) and give good reasons, tied to the factors specified in the cited regulations for this particular purpose, for the weight assigned . . . . If this is not done, a remand is required." *Id.* The ALJ cannot "collapse[] the two-step inquiry into a single point." *Chrismon v. Colvin*, 531 F. App'x 893, 900 (10th Cir. 2013). Finally, "[i]f the opinion of the claimant's physician is to be disregarded, specific, legitimate reasons for this action must be set forth." *Byron v. Heckler*, 742 F.2d 1232, 1235 (10th Cir. 1984).

Here, the ALJ impermissibly merged the two-step inquiry when she rejected Dr. Pacheco's fibromyalgia questionnaire as "conclusory" and "inconsistent with the doctor's own prior findings." AR at 15. While the ALJ did identify reasons to decline giving Dr. Pacheco's opinion *controlling* weight—supposed inconsistency with this prior findings—at no point did she specifically address her reasons for rejecting the opinion in its entirety.

"Even if a treating opinion is not given controlling weight, it is still entitled to deference . . . ." *Krauser v. Astrue*, 638 F.3d 1324, 1330 (10th Cir. 2011). Here, multiple factors weigh in favor of giving Dr. Pacheco's opinion significant, if not controlling, weight. First, Dr. Pacheco was one of Plaintiff's treating physicians over the period of several years. "Longitudinal records reflecting ongoing medical evaluation and treatment from acceptable medical sources are especially helpful in establishing both the existence and severity of [fibromyalgia]." *Titles II & XVI: Evaluation of Fibromyalgia*, SSR 12-2p, 2012 WL 3104869, at *3 (July 25, 2012). In addition to having the benefit of a longitudinal record, Dr. Pacheco is also a specialist in rheumatology, and, as such, his

18

opinion should be given "more weight." 20 C.F.R. § 404.1527(c)(5).

Because the ALJ failed to explicitly consider and apply the six-factor analysis for assigning weight to non-controlling treating source opinions at step two, as required by the Tenth Circuit, the Court will remand this case to the ALJ.

## IV. CONCLUSION

Plaintiff has demonstrated that the ALJ erred at step four of the sequential analysis by improperly evaluating the weight to be given to the opinion of Plaintiff's treating physician, Dr. Pacheco. Therefore, Plaintiff's Motion to Reverse or Remand (*doc. 19*) is GRANTED, and this action is remanded to the Commissioner for further proceedings consistent with this opinion.

IT IS SO ORDERED.

_____
GREGORY B. WORMUTH
UNITED STATES MAGISTRATE JUDGE
**Presiding by consent**